IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| CAROLINA QUARRIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:20CV1043 |
| | ) | |
| MARTIN MARIETTA MATERIALS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

LORETTA C. BIGGS, District Judge.

Plaintiff Carolina Quarries, Inc. brings this action for declaratory judgment, breach of implied covenant of good faith and fair dealing, and summary ejectment against Defendant Martin Marietta Materials, Inc. (ECF No. 28 ¶¶ 69–89.) Before the Court are cross-motions for summary judgment, (ECF Nos. 74 & 80), as well as Defendant's motion to seal its brief in support of its motion for summary judgment, (ECF No. 82). For the reasons that follow, Plaintiff's motion for partial summary judgment, (ECF No. 74), will be denied; Defendant's motion for summary judgment, (ECF No. 80), will be granted; and Defendant's motion to seal, (ECF No. 82), will be denied as moot.

**I.  BACKGROUND**

Plaintiff Carolina Quarries, Inc. operates a granite quarry in Salisbury, North Carolina. (ECF No. 28 ¶¶ 11–12.) Plaintiff contracted to lease mineral rights, for thirty years, in a portion of that quarry totaling 150-acres (the "Property") to Defendant Martin Marietta Materials, Inc.—a crushed stone, sand, and gravel supply company. (*Id.* ¶¶ 18, 23.) Defendant

signed the Option and Lease Agreement ("Lease") in 1998 and formally exercised its option in 2001.  (*Id.* ¶¶ 23–29.)

The Lease provided that its purpose was to "grant all rights to [Defendant] for mining, quarrying, and removal" from the Property minerals, "together with the full and exclusive right, privilege and option . . . to construct, operate, or maintain mining itself, or to permit others to construct, operate or maintain" mining facilities and activities, "which in the sole discretion of [Defendant] are required for the processing or selling of crushed aggregate." (ECF No. 28-1 at 3.)  In the Lease, the parties agreed that "if [Defendant] commences its mining operation, then, in addition to operating its own pit, [Defendant] will use and process as much of [Plaintiff's] 'waste rock' as [Defendant], in its sole discretion, deems feasible and practicable."  (*Id.* at 4.)  The Lease required Defendant to pay an annual rental over the thirty-year term.  (*Id.*)  Defendant was additionally required to pay royalties to Plaintiff on each ton of crushed aggregate it mined and sold; however, the parties agreed that "[t]here is no requirement that [Defendant] continuously conduct quarrying activity on the premises or that [Defendant] actually remove or sell stone, sand or gravel from the premises, it being the clear understanding of the parties that the minimum rental fairly compensates [Plaintiff] for the use of the premises."  (*Id.*)

Under the Lease, a "default" would occur if Defendant should "neglect or fail to pay the rent or other charges payable hereunder" when due and for a period of fifteen days after written notice from Plaintiff; or "vacate or abandon the Property for a period of time exceeding six (6) months."  (*Id.* at 7–8.)  If Defendant defaulted, the Lease allowed Plaintiff to "immediately or at any time thereafter, and without demand or notice, enter into and upon

the Property or any part thereof . . . and repossess the same . . . and expel [Defendant] . . . and upon entry, as aforesaid, this lease shall terminate." (*Id.* at 9.)

Defendant paid the annual rental each year from 2001, but never commenced mining operations. (ECF No. 28 ¶ 47.)

In November 2019, the parties' representatives met in Salisbury to inspect the Property and discuss Defendant's intentions. (ECF No. 28 ¶ 52.) Defendant did not, according to Plaintiffs, follow up concerning their plans or commence mining operations. (*Id.* ¶ 57.)

In April 2020, Plaintiff wrote Defendant to announce that the Lease was terminated, claiming that Defendant had "abandoned the premises as it has failed to operate from and occupy them . . . since the execution of the Agreement." (*Id.* ¶¶ 55–56.)

Plaintiff commenced this action on November 18, 2020. (ECF No. 1.) On September 3, 2021, this Court denied Defendant's motion to dismiss, noting that the construction of the "abandon or vacate" term in the Lease "preclude[d] dismissal on a motion for failure to state a claim." (ECF No. 19 at 11.) Plaintiff subsequently filed an amended complaint. (ECF No. 28.)

Plaintiff's amended complaint contains three counts. (*Id.* ¶¶ 69–89.) Under Count I, Plaintiff seeks a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that: (1) Defendant is in default under the Lease; (2) Plaintiff may properly take possession of the Property and bar Defendant from the same; (3) the Lease is terminated; and (4) Defendant is liable for the minimum annual rental due for the balance of the thirty-year lease term. (*Id.* ¶¶ 72–75.) Under Count II, Plaintiff alleges that Defendant breached the implied covenant of good faith and fair dealing under North Carolina law by failing to exercise its discretion in a reasonable manner and in good faith. (*Id.* ¶¶ 78–79.) Under Count III,

3

Plaintiff requests a judgment for damages and authorizing its immediate repossession of the Property and ejectment of Martin Marietta under North Carolina law. (*Id.* ¶ 89.)

Plaintiff now moves for partial summary judgment on Counts I and III, (ECF No. 74 at 1), and Defendant moves for summary judgment on all three counts, (ECF No. 80 at 1).

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it 'might affect the outcome of the suit under the governing law.'" *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (internal citations and quotations omitted). "[I]n deciding a motion for summary judgment, a district court is required to view the evidence in the light most favorable to the nonmovant" and to "draw all reasonable inferences in his favor." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019) (citing *Jacobs*, 780 F.3d at 568). A court "cannot weigh the evidence or make credibility determinations," *Jacobs*, 780 F.3d at 569 (citations omitted), and thus must "usually" adopt "the [nonmovant's] version of the facts," even if it seems unlikely that the moving party would prevail at trial, *Witt v. W. Va. State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

Where the nonmovant will bear the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, then the burden shifts to the nonmoving party to point out "specific facts showing that there is a genuine issue for trial."

4

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In so doing, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Instead, the nonmoving party must support its assertions by "citing to particular parts of . . . the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1); *see also Celotex*, 477 U.S. at 324.

Where, as in this case, the Court has before it cross-motions for summary judgment, the Court reviews each motion separately to determine if either party is entitled to judgment as a matter of law. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003).

## III. DISCUSSION

### A. Statute of Limitations

As an initial matter, the Court must address whether Plaintiff's claims are barred by the statute of limitations. Defendant maintains that all three claims by Plaintiff are time-barred under North Carolina's three-year statute of limitations, and thus Defendant is entitled to judgment as a matter of law. (ECF Nos. 84 at 25–26; 91 at 6.) In response, Plaintiff maintains that "[t]he running of the applicable limitations period was tolled by the continuing wrong doctrine."[1] (ECF No. 94 at 10.)

---

[1] Plaintiff makes an additional argument in passing suggesting that certain non-waiver language in the Lease precludes Defendant from raising a statute of limitations defense. (ECF No. 89 at 21.) That language provides: "No delay or omission to exercise any right or power accruing upon default shall impair any such right or power or shall be construed to be a waiver thereof, but any such right and power may be exercised from time to time and as often as may be deemed expedient." (ECF No. 80-1 at 11.) However, Plaintiff provides no additional support for this argument, and that language says nothing about the waiver of an affirmative defense—statute of limitations or otherwise. The Court thus finds Plaintiff's argument unpersuasive.

5

Under N.C. Gen. Stat. § 1-52(1), an action brought "[u]pon a contract, obligation or liability arising out of a contract, express or implied" must be brought "[w]ithin three years." "The general rule for claims other than malpractice is that a cause of action accrues as soon as the right to institute and maintain a suit arises." *Williams v. Blue Cross Blue Shield of N.C.*, 581 S.E.2d 415, 423 (N.C. 2003).

North Carolina courts, however, recognize the "continuing wrong" or "continuing violation" doctrine as an exception to the general rule. *Id.* That doctrine holds that "a statute of limitations does not begin to run until the violative act ceases." *Id.* "In other words, 'the applicable limitations period starts anew in the event that an allegedly unlawful act is repeated.'" *Epcon Homestead, LLC v. Town of Chapel Hill*, 62 F.4th 882, 889 (4th Cir. 2023) (quoting *Quality Built Homes, Inc. v. Town of Carthage*, 813 S.E.2d 218, 226 (N.C. 2018)). "A continuing violation is occasioned by continual unlawful acts, not by continual ill effects from an original violation." *Williams*, 581 S.E.2d at 423 (quoting *Ward v. Caulk*, 650 F.2d 1144, 1147 (9th Cir. 1981)). In determining whether a party suffers from a continuing violation, North Carolina courts will consider "[t]he particular policies of the statute of limitations in question, as well as the nature of the wrongful conduct and harm alleged." *Id.*

Here, Plaintiff acknowledges that its "claims are pegged to the allegation that [Defendant] has been in default by virtue of having failed to take possession of the Property at any point over more than two decades." (ECF No. 94 at 10.) Plaintiff contends that Defendant had a continuing "duty not to vacate," and Defendant's repeated failure to take possession of the Property constituted repeated violations of the Lease's prohibition on vacating the Property for a period of six months. (*Id.*)

6

The Court is not persuaded that Defendant's alleged wrongdoing—failing to ever take physical possession of the property since the start of the Lease in 2001—constitutes "continual unlawful acts." Rather, Plaintiff's claim stems from the "continual ill effects from an original violation"—namely, Defendant's failure to *ever* enter the Property. Defendant never once asserted its physical presence on the Property; thus, any harm Plaintiff may have suffered as a result necessarily stemmed from that initial purported violation. The Court finds that it defies logic to contend that a party could continually vacate a property that it never once entered over a twenty-year period.

Both parties cite *Martin v. Ray Lackey Enterprises, Inc.*, 396 S.E.2d 327 (N.C. Ct. App. 1990), as bolstering their respective positions. (ECF Nos. 91 at 6; 94 at 10.) While *Martin* provides general law surrounding the statute of limitations, its facts are not particularly instructive here. The plaintiff in *Martin* alleged that the defendants had breached a lease agreement by failing to pay certain real estate taxes and insurance premiums required under the lease. 396 S.E.2d at 329. The court noted that "where obligations are payable in installments, the statute of limitations runs against each installment independently as it becomes due." *Id.* at 332 (citing *U.S. Leasing Corp. v. Everett, Creech, Hancock, & Herzig*, 363 S.E.2d 665, 669 (N.C. Ct. App. 1988)). The court ultimately held that "the defendants' tax obligation became due on an annual basis, and the statute of limitations ran independently on each annual default." *Id.*

The Court does, however, find *Christenbury Eye Center, P.A. v. Medflow, Inc.*, 802 S.E.2d 888 (N.C. 2017) more helpful in its analysis. In that case, the parties entered into a contract that required the defendant to pay royalties for its sales and provide written sales reports to the plaintiff on a monthly basis. 802 S.E.2d at 889–90. Since the beginning of the contract in

7

1999, the defendant never once provided any monthly reports to plaintiff and never paid any royalties. *Id.* at 890. Plaintiff finally brought suit in 2014, and defendant successfully asserted the statute of limitations as a bar to plaintiff's suit. *Id.* The North Carolina Supreme Court ultimately affirmed the trial court's dismissal of plaintiff's claims as time barred, explaining:

> For fourteen years, however, plaintiff did not raise any question or concern regarding its rights to receive written reports and minimum annual royalty payments, nor did it inquire about restricted sales. Any increase in plaintiff's injury therefore represents the "continual ill effects from an original violation," . . . and "aggravation of the original [breach]." Because plaintiff had notice of its injury yet failed to assert its rights, all of plaintiff's claims are time barred.

*Id.* at 892 (citations omitted).

Here, like in *Christenbury*, the Court finds that Plaintiff was aware of Defendant's alleged violation of the Lease and did not raise any question or concern about Defendant's failure to take physical possession of the Property for twenty years. Any lasting harm to Plaintiff stems from the "continual ill effects" and "aggravation" of Defendant's original failure to possess.

Finally, the Court finds that allowing Plaintiff's claims to move forward here would be contrary to the policy rationale behind the statute of limitations. Statutes of limitations "exist to eliminate the injustice which may result from the assertion of stale claims by providing a reasonable but definite time within which a claim must be prosecuted in the courts or be forever barred." *Tierney v. Garrard*, 477 S.E.2d 73, 75 (N.C. Ct. App. 1996) (quoting *Duke Univ. v. Chestnut*, 221 S.E.2d 895, 898 (N.C. Ct. App. 1976)). Plaintiff waited *twenty years* to bring this action premised on Defendant's "vacating" of a property it never once entered.

Accordingly, for these reasons, the Court finds that Defendant is entitled to judgment as a matter of law on all three of Plaintiff's claims on these grounds alone. However, the Court

8

adds that even if the Court accepted Plaintiff's "continuing wrong" argument, Plaintiff's claims would still fail as a matter of law for the foregoing reasons.

### B. Plaintiff's Motion for Partial Summary Judgment

In moving for summary judgment on Count I, Plaintiff asks this Court to declare that: (1) Defendant is in default under the Lease; (2) Plaintiff may properly take possession of the Property and bar Defendant from the same; (3) the Lease is terminated; and (4) Defendant is liable for the minimum annual rental due for the balance of the lease term.

The underlying facts are not in dispute. After Defendant entered into the Lease option in March 2001, it never occupied or took physical possession of the Property. Defendant never requested the key required to gain access to the property, never moved mining or office equipment onto the property, never had any employees based on the property, never posted any signage advertising its presence on the site, and never commenced mining operations on the property. (ECF No. 75 at 2, 11 (citing ECF No. 76 ¶¶ 7–14).) Despite not commencing mining operations or otherwise establishing a presence on the Property, Defendant paid its annual rent for nearly twenty years without issue.[2] (ECF Nos. 75 at 21; 91 at 23.)

Regarding the actual terms of the Lease, only a few provisions are relevant to the Court's analysis. First, as to its purpose, the Lease states:

> The purpose of this Lease is to grant all rights to the Lessee for mining, quarrying, and removal therefrom by blasting and otherwise deposits of rock, stone, DG, gravel, sand, soil, limestone, minerals or earth as may exist on, in or under the Property, together with the full and exclusive right, privilege and option of the Lessee to construct, operate, or maintain mining itself, or to

---

[2] Plaintiff contends that Defendant stopped paying rent in 2019, while Defendant maintains that it tendered payments through 2021, which Plaintiff rejected, then ceased responding to Defendant's request for information. (ECF No. 91 at 23.) Regardless, this single disputed fact does not impact the Court's analysis of whether Defendant is in default under the Lease by "vacating" the Property for more than six months. Plaintiff does not argue that Defendant is in default because it failed to pay rent; Plaintiff only argues that Defendant defaulted under the Lease because it failed "to occupy or otherwise take physical possession of the Property." (ECF No. 75 at 16, 23.)

9

Case 1:20-cv-01043-LCB-JLW   Document 96   Filed 05/10/23   Page 9 of 18

> permit others to construct, operate or maintain quarrying, washing, crushing and other plants, machinery, dams, ponds, canals, power lines, pipe lines, telephone lines, roads, railway spur lines, stockpile areas, buildings or offices, and any other machinery or equipment on the Property, which in the sole discretion of Lessee are required for the processing or selling of crushed aggregate . . . .

(ECF No. 80-1 at 4.)

Second, the Lease clarifies:

> There is no requirement that [Defendant] continuously conduct quarrying activity on the premises or that [Defendant] actually remove or sell stone, sand or gravel from the premises, it being the clear understanding of the parties that the minimum rental fairly compensates [Plaintiff] for the use of the premises.

(*Id.* at 6.)

Last, and most important here, the Lease provides that Defendant would be in default if Defendant "vacate[d] or abandon[ed] the Property for a period of time exceeding six (6) months." (*Id.* at 9.)

Plaintiff's central argument is that Defendant had an obligation under the Lease "to occupy or take physical possession of the Property." (ECF No. 75 at 20). Plaintiff finds this obligation stems from the Lease's "vacate or abandon" provision. (*Id.* at 20–21; *see also* ECF No. 80-1 at 9.) Plaintiff concedes that it is not arguing that Defendant "abandoned" the property, only that it "vacated" it. (ECF No. 94 at 2.) Thus, the only issue for the Court is whether Defendant "vacated" the Property and defaulted under the terms of the Lease.

Plaintiff cites one Fourth Circuit case, *Nehi Bottling Co. v. All-Am. Bottling Co.*, 8 F.3d 157 (4th Cir. 1993), as well as a handful of nonbinding cases, which offer some definition of "vacate" in the commercial retail context. (ECF No. 75 at 19–20.) Those cases distinguish "vacating" from "abandoning" by clarifying that to vacate, a party need not demonstrate "a clear intent not to be bound by the lease." *Nehi Bottling Co.*, 8 F.3d at 162–63. Those cases

offer general dictionary definitions of "vacate" such as "to make vacant or empty." *Id.* at 163 (citing *Vacate*, *Black's Law Dictionary* (6th ed. 1990)).

Notably, in the cases cited by Plaintiff, the leased property at issue was some type of warehouse, retail space, or office building that had been occupied at some point by the party alleged to have "vacated." None speak to Plaintiff's theory regarding an implied obligation to physically possess the Property or are remotely analogous to the Lease for mining and quarrying rights here. However, Plaintiff's cases do support the notion that the "vacate or abandon" provision must be interpreted within the context of the Lease at issue here. *See, e.g.*, *Saul Subsidiary II Ltd. P'ship v. Venator Grp. Specialty, Inc.*, 830 A.2d 854, 862 (D.C. 2003) ("[W]e do not construe the term "vacate" in a vacuum. The question is what the term means as it is used in Article 4(b) of the lease . . . .").

When interpreting contracts under North Carolina law, courts "construe them as a whole." *Christenbury*, 802 S.E.2d at 892 (quoting *Ussery v. Branch Banking & Tr.*, 777 S.E.2d 272, 279 (N.C. 2015)). "Each clause and word is considered with reference to each other and is given effect by reasonable construction." *Id.* (quoting *Ussery*, 777 S.E.2d at 279). Courts will "determine the intent of the parties and the nature of an agreement 'by the plain meaning of the written terms.'" *Id.* (quoting *RL REGI N.C., LLC v. Lighthouse Cove, LLC*, 762 S.E.2d 188, 190 (N.C. 2014)). "[C]ourts must enforce the contract as written; they may not, under the guise of construing an ambiguous term, rewrite the contract or impose liabilities on the parties not bargained for and found therein." *Fairview Devs., Inc. v. Miller*, 652 S.E.2d 365, 367 (N.C. Ct. App. 2007) (quoting *Woods v. Nationwide Mut. Ins. Co.*, 246 S.E.2d 773, 777 (N.C. 1978)).

Here, a fair construction of the terms of the Lease compels the Court to find that the "vacate or abandon" provision does not amount to an implied obligation to physically possess the Property. The Lease is for a potential quarry site, not a commercial building. The construction of "vacate" in the context of a typical commercial lease, for a retailer, for example, is inapposite in the context of this Lease. As the other provisions within the Lease make clear, the parties agreed that "[t]here is no requirement that [Defendant] continuously conduct quarrying activity on the premises or that [Defendant] actually remove or sell stone," and that the parties understood that "the minimum rental fairly compensates [Plaintiff] for the use of the premises." (ECF No. 80-1 at 6.) The natural reading of these terms suggests that Defendant's holding of the Property for potential quarrying by simply paying rent without physically occupying the site would be permissible. The Court cannot, as Plaintiff insists, rewrite the Lease to impose obligations not actually found within the Lease. Accordingly, the Court finds that Defendant is not in default under the Lease. Plaintiff's motion as to Count I will be denied.

Plaintiff's motion as to its summary ejectment claim in Count III fares no better. Section 42-26 of the North Carolina General Statutes provides:

> Any tenant or lessee of any house or land, and the assigns under the tenant or legal representatives of such tenant or lessee, who holds over and continues in the possession of the demised premises, or any part thereof, without the permission of the landlord, and after demand made for its surrender, may be removed from such premises in the manner hereinafter prescribed in any of the following cases.
>
> . . .
>
> (2) When the tenant or lessee, or other person under him, has done or omitted any act by which, according to the stipulations of the lease, his estate has ceased.

N.C. Gen. Stat. § 42-26(a)(2). Plaintiff's claim for summary ejectment hinges on whether Defendant breached the Lease by failing to physically occupy the Property. Having found that

12

Defendant is not in default under the Lease for the reasons already stated, Plaintiff's motion for summary judgment on Count III, its claim for summary ejectment, is likewise denied.

### C. Defendant's Motion for Summary Judgment

As outlined in the Court's analysis of Plaintiff's motion on Counts I and III above, a fair construction of the terms of the Lease leads this Court to find that Defendant is not in default. There being no genuine dispute as to any material fact, the Court finds Defendant entitled to judgment as a matter of law on both Counts I and III.

The Court now turns to Count II, Plaintiff's claim that Defendant breached the implied covenant of good faith and fair dealing. In its amended complaint, Plaintiff alleges that "[t]o the extent that the Lease invests [Defendant] with discretion in terms of whether to take possession of the Property and commence operations . . . [Defendant] was legally obligated to exercise that discretion in a reasonable manner and in good faith so as not to effectively deny [Plaintiff] the material benefits of the Lease." (ECF No. 28 ¶ 79.) Plaintiff further alleges that Defendant "breached the implied covenant of good faith and fair dealing by failing to exercise its discretion in a reasonable manner and in good faith." (*Id.* ¶ 80.)

"Under North Carolina law, every contract contains 'an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement.'" *Cordaro v. Harrington Bank, FSB*, 817 S.E.2d 247, 256 (N.C. Ct. App. 2018) (quoting *Bicycle Transit Auth. v. Bell*, 333 S.E.2d 299, 305 (N.C. 1985)). "A breach of the implied covenant of good faith and dealing requires 'the wrongful intent of a party to deprive another party of its contractual rights.'" *Floyd v. On the Rox Ent. LLC*, No. 19-CV-131, 2020 WL 6049907, at *2 (E.D.N.C. Oct. 13, 2020) (quoting *Dull v. Mut. of Omaha Ins. Co.*, 354 S.E.2d 752, 757 (N.C. Ct. App. 1987)). Where a party "ma[kes], in good faith,

13

what it believed to be a sound business decision based on a reasonable view of its contractual rights," courts will not find a violation of the implied covenant of good faith and fair dealing. *E. Town Mkt., L.P. v. 550 Foods, LLC*, 776 S.E.2d 364 (N.C. Ct. App. 2015) (unpublished table decision).

"[D]etermining whether a party to a contract acted in good faith is a question of fact determined on a case-by-case basis" and thus often "inappropriate for summary judgment," *Madison River Mgmt. Co. v. Business Mgmt. Software Corp.*, 387 F. Supp. 2d 521, 543 (M.D.N.C. 2005), however, where a party provides virtually no evidence or makes only conclusory allegations of bad faith, summary judgment is appropriate, *Forrest Drive Assocs. v. Wal-Mart Stores, Inc.*, 72 F. Supp. 2d 576, 585–86 (M.D.N.C. 1999).

Here, Defendant argues that it is entitled to judgment on this claim because it "exercised reasonable business judgment in deciding not to presently mine." (ECF No. 84 at 20.) Defendant maintains that "[t]he record establishes multiple, undisputed facts that made it objectively reasonable for [Defendant] not to mine the Property," including that "demand in the market is met by existing sites"; "opening a new site would cost millions of dollars"; "demand collapsed during the Great Recession and has never recovered"; "opening the site would cause [Defendant] to lose money"; "the projected US 52 expansion has yet to materialize"; and last, that "the 'one-off' projects that [Defendant] considered over the years did not justify the costs to mobilize an operation." (*Id.* at 24.)

Plaintiff, in response, argues that there is a genuine issue of material fact with regard to Defendant's motivations in never commencing operations on the Property. (ECF No. 89 at 16–18.) As support for its argument, Plaintiff restates allegations made in its amended complaint that Defendant "leased the Property not for operational purposes but solely to take

14

it off the market and render it unavailable as a valuable source of raw materials to its competitors." (*Id.* at 17.) The only evidence Plaintiff cites is the following testimony by Defendant's vice president and general manager:

> Q. Would, in your view, the . . . benefits to Martin Marietta of leasing the [P]roperty, would they be the same benefits that a competitor would receive if they would have leased the property?
>
> A. Yes.
>
> Q. And by leasing the property, it would be off market to those competitors. Correct?
>
> A. Correct.

(ECF No. 77-14 at 125:5-13.) Plaintiff also cites one of its expert's opinions that "[Defendant] appears to have made the strategic decision specifically to not commence operations despite being in a position to do so, and to ensure that no other aggregates company could work that site." (ECF No. 63-1 at 20.)

The Court ultimately finds that there is no genuine issue of fact regarding Defendant's good-faith conduct, and that Defendant is thus entitled to summary judgment on Plaintiff's claim for breach of the implied covenant of good faith and fair dealing. Plaintiff presents no evidence, outside of conclusory statements, contradicting the reasonableness of Defendant's decision not to begin mining operations. Defendant, on the other hand, points to uncontradicted testimony suggesting unfavorable market conditions and demand, (ECF Nos. 80-12 at 71:4–72:4; 80-18 at 61:9-17), the financial infeasibility of beginning operations, (ECF Nos. 80-12 at 110:4–111:18; 80-15 at 36:2-25), and the failure of the U.S. Route 52 project or any other major project to materialize, as all underlying the decision not to ever operate on the Property, (ECF No. 80-15 at 31:12–33:24, 58:25–60:19, 64:23–65:5, 105:11–107:1). (ECF No. 84 at 7–12.) North Carolina courts have been clear that "a party's desire to

15

avoid financial losses constitutes reasonable grounds for declining to perform otherwise applicable contractual obligations." *Strategic Outsourcing, Inc. v. Cont'l Cas. Co.*, 274 F. App'x 228, 234 (4th Cir. 2008). Based on the record here, Defendant's decision to never commence mining operations on the Property appears more than reasonable and consistent with the terms of the Lease.

Further, the one expert Plaintiff cites as supporting its competition-suppression theory provided, in the same report, that "[w]hile [Defendant] could have gone operational at the [Property], there does not appear to have been any pressing need to do so and, in fact, doing so stood to directly and negatively impact the profitability of [Defendant]'s other operations in the micro-market in and around Rowan County." (ECF No. 63-1 at 20.) In addition, in that same expert's deposition, he testified that "there could be a million reasons" why Defendant is not mining on the Property. (ECF No. 80-13 at 82:07–84:16.) He also suggested the failure to include an affirmative duty to mine in the terms of the Lease was an "oversight" and that the Lease was generally a "bad deal" made by Plaintiff. (*Id.* at 120:12-21, 145:16-23.) While a court's job at summary judgment is not to make credibility determinations, a "self-serving opinion . . . cannot, absent objective corroboration, defeat summary judgment." *CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020) (quoting Wi*lliams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004)); *see also Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012) (noting that "[a]lthough we do not make credibility determinations at the summary judgment phase, we should also not find a genuine dispute of material fact based solely on [a party's] self-serving testimony"); *Felty v.*

*Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) ("Unsupported speculation is not sufficient to defeat a summary judgment motion.").

Further, in the Court's view, the single deposition exchange by Defendant's vice president which Plaintiff points to does nothing to further Plaintiff's theory or create a genuine issue of material fact regarding whether Defendant leased the Property to suppress competition. Answering "yes" to a question about whether Defendant's decision to lease the Property would make it "off market" to competitors is a commonsense conclusion and not the smoking gun Plaintiff suggests. (ECF No. 89 at 17.) Further, in the same deposition, when asked whether Defendant leased the site to limit competition, the same witness testified "No."[3] (ECF No. 93-2 at 133:6-18.)

In sum, Plaintiff provides nothing more than conclusory statements supporting its theory that Defendant leased the property to suppress competition or otherwise behaved in bad faith. Accordingly, the Court does not find that any genuine issue of material fact exists, and that Defendant is entitled to judgment as a matter of law on Plaintiff's breach the covenant of good faith and fair dealing claim. Defendant's motion as to Count II will be granted.

The Court, having now concluded that even if it were to accept Plaintiff's "continuing wrong" tolling argument, which it does not, finds that Defendant would still be entitled to judgment as a matter of law as to each of Plaintiff's claims. Accordingly, Defendant's motion for summary judgment will be granted.

---

[3] In a footnote, Plaintiff offhandedly suggests that this witness, Mr. Hardy, was coached by counsel during a break which "calls into question his candor and credibility." (ECF No. 89 at 17 n.4. ("Following a lunch break during which he presumably conferred with Martin Marietta's counsel, Mr. Hardy attempted to walk back his testimony.").) This unsubstantiated allegation has no bearing on this Court's analysis.

17

### D. Defendant's Motion to Seal

Defendant initially filed a motion to seal its brief in support of its motion for summary judgment, (ECF No. 82), however, as represented in a subsequent filing, (ECF No. 87), the parties have resolved all issues regarding that motion and recommend denying the motion to seal as moot. (ECF No. 87 ("Plaintiff's confidentiality designations necessitating the motion to seal have been waived and Martin Marietta's Motion to Seal Brief in Support of Summary Judgment, (ECF No. 82), may be denied as moot.").) The Court grants this request.

For the reasons stated herein, the Court enters the following:

### ORDER

**IT IS THEREFORE ORDERED** that Plaintiff Carolina Quarries, Inc.'s Motion for Partial Summary Judgment, (ECF No. 74), is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Martin Marietta Material Inc.'s Motion for Summary Judgment, (ECF No. 80), is **GRANTED**, and this action is hereby **DISMISSED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Seal, (ECF No. 82), is **DENIED AS MOOT**.

This, the 10th day of May 2023.

/s/ Loretta C. Biggs
United States District Judge